## STATE OF MARYLAND v. ERNEST DUBOSE

[No. 626, September Term, 1972.]

*Decided March 9, 1973.*

---

294

The cause was argued before ORTH, C. J., and MOYLAN and CARTER, JJ.

*George A. Eichhorn, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Elias Silverstein, Assistant State's Attorney for Prince George's County,* on the brief, for appellant.

*Bruce R. Harrison* for appellee.

ORTH, C. J., delivered the opinion of the Court.

On 11 July 1972 an indictment was returned in the Circuit Court for Prince George's County presenting that on 7 May 1972 ERNEST DUBOSE "feloniously, wilfully and of his deliberately premeditated malice aforethought, did murder James Smith." On 20 October 1972 the Circuit Court for Prince George's County granted a motion by defense counsel to dismiss the indictment. The State appealed. *State v. Hunter,* 10 Md. App. 300, 307. We hold that the court erred in granting the motion to dismiss.

The court granted the motion to dismiss on the ground of a denial of a speedy trial. We have discussed and applied the constitutional right to a speedy trial in numerous cases from *State v. Long and Nelson,* 1 Md. App. 326, *cert. denied,* 247 Md. 740, *cert. denied,* 390 U. S. 983, to *State v. Hunter,* 16 Md. App. 306. For a comprehensive review of our holdings see *State v. Lawless,* 13 Md. App. 220. One of the infrequent occasions in which the Supreme Court of the United States has dealt with the

Sixth Amendment right to a speedy trial was in *Barker v. Wingo,* 407 U. S. 514, decided 22 June 1972. We find it significant that the opinion of the Court noted, at 519: "The right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused." It pointed out three major differences: (1) there is a societal interest in providing a speedy trial which exists separate from and at times in opposition to, the interests of the accused, at 519; (2) deprivation of the right may work to the accused's advantage, and does not *per se* prejudice the accused's ability to defend himself, at 521; (3) the right to a speedy trial is a more vague concept than other procedural rights. "It is, for example, impossible to determine with precision when the right has been denied." At 521. The Court accepted a balancing test to ascertain a violation of the right. In the balancing test "the conduct of both the prosecution and the defendant is weighed." It necessarily compels the courts to approach speedy trial cases on an *ad hoc* basis, but the Court identified four factors which should be assessed in determining whether a particular defendant has been deprived of his right: Length of delay, the reason for the delay, the defendant's assertion of the right, and prejudice to the defendant. At 530.

In the case before us, the greatest possible period of delay, assuming Dubose was arrested the same day the crime was committed, was no more than 5½ months, and the record shows that a relative small portion of the delay was chargeable to the State in any event. Dubose was arraigned on 13 July, and the case was continued to retain counsel. Appearance of counsel was entered on 18 July. Dubose's motion to set bail was argued in open court on 21 July. Trial was set for 23 August. On 22 August motion was filed to withdraw counsel and on 23 August the motion was denied and the case continued by mutual agreement. Trial was set for 10 October. On that date the State's motion for a continuance was granted, Dubose's motion to dismiss the indictment for lack of a

speedy trial being denied. The reason for the continuance was explained by the Assistant State's Attorney: "[T]here has been within the last 48 hours a new development in the case, that because of the holiday the State is seeking the continuance in order for the detectives to finish the investigation." The State said it would be prepared to try the case within 10 days. Trial was set for 20 October. The court said that it was treating Dubose's motion to dismiss the indictment and for a speedy trial as two motions, one to dismiss the indictment, which it denied, and the other as a motion for a speedy trial, which it granted. "So that if on October 20th the State is not prepared to go forward and the matter comes before this member of the Bench I would be inclined to dismiss the indictment at that time."

On 20 October the State moved for another continuance:

"Your Honor, I would move for a continuance based on the fact that there has been newly discovered evidence on behalf of the State in that a witness was found who—and I called Mr. Harrison [Defense Counsel] on Thursday to tell him who the witness was and give him a list of the other witnesses. I personally interviewed this witness yesterday at about two o'clock, 1:30 to two o'clock, at St. Elizabeth's Hospital. This witness told me than he was in a jail cell with the defendant. The defendant told him that the charge in Prince George's County was a lot of—I am going to use 'malarkey' instead of the obscenity which he used—because he said the murder occurred in Washington and that he had participated in the murder in Washington.

The State has summonsed Dr. Fisher, Russell Fisher, the medical examiner, who was the chief medical expert for the State of Maryland and

who participated in the autopsy. Dr. Fisher had called my office earlier, at least five days ago, to inform me that he couldn't be here because he had a medical convention, I believe, in St. Louis, Missouri, or a seminar, I don't recall. At that time I made a judgment that because of the pending trial and because of His Honor's feeling that—and Mr. Harrison had agreed to the stipulation as to the autopsy report, that to accommodate everyone I would go without Dr. Fisher's testimony and with the stipulation.

However, based upon the witness' statement yesterday in St. Elizabeth's Hospital to the effect that the defendant had told him—and this is an admission against interests—that the crime had occurred in Washington, it becomes pertinent and relevant and completely changes the picture as far as the State's case in that Dr. Fisher's testimony is absolutely vital that the body—it could be either inculpatory or exculpatory. Dr. Fisher may come in and say that the body was murdered in Washington and dumped in Prince George's County. I don't know. * * * He may. I don't know what he is going to say because Dr. Fisher has to— * * * —see the pictures of the scene and the other—there is nothing in the autopsy report.

Now, I would respectfully ask for a continuance based upon the absence of Dr. Fisher. And I did not insist—I will be perfectly candid with the Court, I did not insist that Dr. Fisher be present at that time when he told me of his seminar because of the fact of the stipulation. However, the new evidence, the testimony of the man, that of the witness that Dubose had told him in the jail that the charges were malarkey because the crime occurred in Washington and he was present and that the murder

occurred in Washington in a car—now, this may be exculpatory to the defendant here in this state and it may be inculpatory in Washington.

On the other hand, the State is faced with the problem that because of this new evidence, because of the new statement, the State must have Dr. Fisher present. * * *

The other reason the State is asking for a continuance is that because of the nature of the crime, that it may have occurred in Prince George's County or it may have occurred in Washington, D.C., I called in the U. S. Attorney, John Evans, who informed me that he would be here today. I am informed by my office that the District of Columbia has just arrested a man by the name of Patterson who had in his possession a nine millimeter automatic. These are rather rare weapons and ammunition. They are sending that gun to the FBI.

I would also ask for a continuance and I would place on the record the fact that I attempted to call Mr. Harrison yesterday before I went to St. Elizabeth's Hospital to tell him that I had learned that his man had made a statement to the police. However, Mr. Harrison called me at seven o'clock this morning and I told him I had two pieces of information to tell him. The one piece of information was that of the witness' testimony that the crime might have occurred in Washington. The other being that there was a statement made by Dubose to the police which was not committed to writing. It was somewhat of a negative statement. However, it is a statement. He has had discovery of my file. There does not appear in that file that he did make a statement. I wanted to make sure that Mr. Harrison was aware of that."

The court denied the continuance and insisted that the case go to trial. Before trial commenced, however, Du-

bose moved to dismiss the indictment. The court granted the motion.

We think it abundantly clear that the delay properly chargeable to the State was not of constitutional dimension. It was obviously not a delay which was presumptively prejudicial. The charge was murder, and such a crime tolerates more delay in any event than a less serious offense. Therefore, under the authority of *Barker* "there is no necessity for inquiry into the other factors that go into the balance." 407 U. S. at 530. There was no violation, in the circumstances here, of the constitutional right to a speedy trial.

The action of the trial court, however, appears even more cavalier when the other factors are considered. Different weight should be assigned to different reasons given by the State to delay the trial. We see not the slightest indication that the State deliberately attempted to delay the trial in order to hamper the defense. It advanced a valid reason for a continuance. *Barker* said, at 531: "[A] valid reason, such as a missing witness, should serve to justify appropriate delay." The Court said flatly in *Barker*, at 521-522: "If, for example, the State moves for a 60-day continuance, granting that continuance is not a violation of the right to a speedy trial unless the circumstances of the case are such that further delay would endanger the values the right protects." We see no such endangering here. As to the factor of prejudice, it, according to *Barker*, at 532, must be assessed in the light of the interest of defendants which the speedy trial right was designed to protect. Of the three such interests identified by the Court; "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) [the most serious] to limit the possibility that the defense will be impaired," none were sufficiently shown by Dubose.

The Supreme Court said in *Beavers v. Haubert*, 198 U. S. 77, 87, and affirmed in *Barker*, at 522:

300

"The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice."

Justice is supposed to be swift but deliberate. *United States v. Ewell,* 383 U. S. 116, 120. The action of the trial court in the circumstances shown by the record was not necessary to secure Dubose's rights, but did preclude the rights of public justice, because it meant that Dubose, charged with a serious crime, went free without being tried. It is patent that the severe remedy of dismissal of the indictment, proper when the right to a speedy trial is denied, was nowise here warranted.

> *Grant of motion to dismiss indictment in criminal trial No. 12480 reversed; case remanded for trial; costs to be paid by appellee; mandate to issue forthwith.*